**GODIX EQUIPMENT EXPORT CORP.,
a Florida corporation, Plaintiff,**

**v.**

**CATERPILLAR, INC., a Delaware
corporation, Defendant.**

**Angel L. GONZALEZ d/b/a Universal
Service Co., Plaintiff,**

**v.**

**CATERPILLAR, INC., a Delaware
corporation, Defendant.**

**Nos. 93–1624–CIV, 93–1557–CIV.**

United States District Court,
S.D. Florida,
Miami Division.

Nov. 14, 1996.

ral aides)—should be dissolved.

 

Ronald Katz, Janet A. Hart, Coudert Brothers, San Francisco, CA, Mark E. Buechele, Miami Beach, FL, for Plaintiff.

Robert Abrams, Gregory L. Baker, Howrey & Simon, Washington, DC, Benedict P. Kuehne, Sale & Kuehne, P.A., Miami, FL, James B. Buda, Product Counsel, Caterpillar, Inc., Peoria, IL, for Defendant.

## ORDER ON MOTIONS FOR JUDGMENT AS A MATTER OF LAW

NESBITT, District Judge.

### I. Preliminary Statement

This cause came before the Court upon Defendant's Motions for Judgment as a Matter of Law Regarding Plaintiffs' Antitrust and State Law claims, filed October 21, 1996, Plaintiffs' Motions for Judgment as a Matter of Law on the Subjects of Geographic Market, Market Power, and Product Market, filed October 21, 1996, Plaintiffs' Motion to Dismiss Counts IX and X, filed October 21, 1996, and Plaintiffs' Oral Motion for Injunctive Relief, argued October 24, 1996. This written order is entered to supplement and amplify the Court's oral findings and rulings entered on the motions at the conclusion of the case on October 21, 1996.

In the consolidated actions for antitrust violations and various state claims, Plaintiffs Angel L. Gonzalez d/b/a Universal Service Company ("Gonzalez") and Godix Equipment Corporation ("Dixon"), resellers of Caterpillar replacement parts, seek damages and an injunction against Caterpillar for the implementation of Caterpillar's "Export Parts Policy" in general and as it applies to Plaintiffs' businesses. Plaintiffs claim that as a result of Defendant's fraud, tortious conduct, price-fixing, and so called "black list," Gonzalez lost customers and Dixon lost his entire business.

### II. Facts

Defendant Caterpillar manufactures and sells construction machinery, agricultural machinery, engines, and parts for those machines to customers worldwide. Caterpillar is one of the world's largest companies in this field, with sales exceeding ten billion dollars

annually. A world-wide independent dealer network has developed to sell Caterpillar machines and replacement parts as well as provide local service and support to foreign Caterpillar customers. There are over 500,-000 replacement parts for Caterpillar products. The replacement parts for Caterpillar machines are either genuine Caterpillar parts, produced and distributed by Caterpillar, or other "will-fit" parts. The "will-fit" parts are produced by other companies either at the direction of Caterpillar or independently and will operate interchangeably in Caterpillar machines.

Plaintiffs' companies function as "parallel" traders or resellers to the Caterpillar dealer network in the replacement parts market. They buy genuine Caterpillar parts or "will-fit" parts either from Caterpillar or independent suppliers and then re-market them to domestic exporters or directly to foreign customers ("end users"). Plaintiffs claimed that their success in the market was due to their ability to provide more efficient service to end users, through their well developed distribution channels, and their generally lower prices. Part of the reason why Plaintiffs were able to provide and maintain a lower price was the streamlined nature of their companies. Unlike authorized Caterpillar dealers, Plaintiffs had no service departments or product support services.

In 1982, Caterpillar instituted the "Export Parts Policy" to eliminate what it recognized as an ongoing problem of free-riding and dealer misconduct among resellers and other dealers of genuine Caterpillar Parts. To allow Caterpillar to maintain some destination control, the "Exports Parts Policy" required Caterpillar parts dealers to identify the end users for each part sold. Additionally, the "Export Parts Policy" charged a higher wholesale price to provide a pool of funds to pay credits to local dealers who provided services. Caterpillar claimed that without the "Export Parts Policy," its dealers were, in effect, subsidizing resellers such as Plaintiffs because Caterpillar dealers maintained service departments and other product support services while the resellers were free to only sell replacement parts. In 1990, as a further step to strengthen its support system and eliminate free riding, Caterpillar created the Caterpillar Export Services ("CES") as an umbrella agency to sell all genuine Caterpillar parts to authorized dealers around the world.

Gonzalez is a reseller of Caterpillar replacement parts, selling genuine Caterpillar parts as well as other "will-fit" non-genuine Caterpillar parts to end users mainly in Latin America. Gonzalez claims that as a result of the "Export Parts Policy," he can no longer purchase from any Caterpillar dealer genuine Caterpillar parts for export, negotiate a "discount price" with Caterpillar dealers, or ship genuine Caterpillar replacement parts directly to an end user in another country. Gonzalez also claims that at the inception of the CES, he was induced to turn over his confidential customer lists to CES, believing that they would remain confidential.

After the implementation of the "Export Parts Policy," purchase of genuine Caterpillar replacement parts for export is to be made through either CES by an authorized agent ("Caterpillar dealer") or through an authorized purchasing agent who was to furnish CES with an overseas end user code to insure authorized distribution. The wholesale price and terms from CES under the "Export Parts Policy," the "Export Dealers Net Price," is fixed at 90 percent of the suggested retail price which is an increase from 75 percent of the suggested retail price from the pre-policy period. To reach the 90 percent charge under the current Export Parts Policy, a five percent charge for CES overhead and a ten percent charge to finance service departments and other product enhancing efforts at overseas Caterpillar dealers is added to the fixed 75 percent rate. The Caterpillar dealers, however, may negotiate the final retail sale price and terms with the individual overseas end users.

Gonzalez claims that because genuine Caterpillar replacement parts for export can only be purchased through CES, he is no longer able to obtain the discounts previously negotiated with individual Caterpillar dealers under the pre-policy prices. Additionally, Gonzalez asserts that he can no longer obtain parts at a discount because of the increase in wholesale prices and because of an agree-

ment between Caterpillar and Caterpillar dealers to adhere to the suggested retail price and eliminate any potential discounts from that price. The effect of the loss of discounts would be to price Gonzalez out of the genuine Caterpillar parts reseller's market.

Gonzalez also contends that as an unauthorized reseller doing business in overseas markets, he was placed on the Caterpillar "Reseller List," referred to by Plaintiffs as the "black list," and denied the opportunity to purchase any genuine Caterpillar parts from CES or any other Caterpillar dealer. Gonzalez claims that Caterpillar used reinvoicing, audits, sting operations, and other enforcement techniques to fine and punish any Caterpillar dealers who sold genuine Caterpillar parts to him for overseas resale. As a result of not being able to purchase and sell genuine Caterpillar parts directly, Gonzalez maintains that he lost end user customers who regularly purchased genuine Caterpillar parts from him, and as a consequence suffered a substantial loss in profits from those lost sales.

Dixon was also a reseller of Caterpillar replacement parts, but he sold only genuine Caterpillar replacement parts to overseas end users. Dixon's claims are substantially similar to Gonzalez's in that he can no longer purchase genuine Caterpillar parts for export from any Caterpillar dealer, negotiate a "discount price" with Caterpillar dealers, or ship genuine Caterpillar replacement parts directly to an end user. Dixon also alleges that Caterpillar similarly induced him to turn over his customer lists on the condition that they would be kept confidential.

Dixon claims that as a result of the "Export Parts Policy" he lost his business. Specifically, Dixon contends that he was denied his only access to genuine Caterpillar parts and he was not in the business of selling other will-fit or generic Caterpillar parts.

### III. Claims Alleged

On April 20, 1995 each Plaintiff filed an eleven count Amended Complaint alleging parallel antitrust and state claims against Caterpillar in relation to the implementation of Caterpillar's "Export Parts Policy." Of the remaining counts [1]: Count I alleges that Caterpillar committed fraud in inducing Plaintiffs to disclose confidential customer lists resulting in a loss of business; Count II alleges that Caterpillar tortiously interfered with Plaintiffs' business relationships with their clients; Counts III and IV allege violations of the Sherman Antitrust Act by Caterpillar, claiming that Caterpillar conspired with its dealers to fix retail prices for genuine Caterpillar parts in violation of 15 U.S.C. § 1, exercised its monopoly power to exclude Plaintiffs from the replacement parts market by the implementation of a "black list", and attempted to monopolize the entire market for Caterpillar replacement parts in violation of 15 U.S.C. § 2; and Counts V and XI reallege the basis for the antitrust violations and request that the Court grant injunctive relief.

### IV. Applicable Law

A party seeking Judgment as a Matter of law at the end of the trial must demonstrate that there "is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." FED.R.CIV.P. 50(a)(1). A Motion for Judgment as a Matter of Law may be made at any time before submission of the case to the jury and such a motion shall "specify the judgment sought and the law and the facts upon which the moving party is entitled to the judgment." FED. R.CIV.P. 50(a)(2). The Court will grant a motion for a judgment as a matter of law "only if the facts and inferences are so strong that the Court believes that reasonable persons in the exercise of impartial judgment could not arrive at a contrary verdict." *Oxford Furniture Companies, Inc. v. Drexel Heritage Furnishings, Inc.*, 984 F.2d 1118, 1122 (11th Cir.1993). In such instances, the Court will view all evidence and all inferences in the light most favorable to the nonmoving party. *Id.* If the evidence allows reasonable persons to reach different conclusions, the Court will deny the motion for a judgment as

---

1. Counts VII and VIII were dismissed prior to trial and Counts VI, IX and X were dismissed voluntarily during trial by the Plaintiffs.

a matter of law and allow the case to go to a jury. *Id.; Johns v. Jarrard,* 927 F.2d 551, 557 (11th Cir.1991) ("where substantial conflicting evidence exists in the record, a directed verdict is improper"). The inquiry, then, is whether there is sufficient evidence, when taken in the light most favorable to the non-moving party, for a jury to find for that party. *Id.*

## V. Discussion

### A. Sherman Act—Section I Conspiracy

Section I of the Sherman Act, 15 U.S.C. § 1, provides in pertinent parts that:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared illegal.

15 U.S.C. § 1 (1990).

■ Plaintiffs claim that Caterpillar violated Section I of the Sherman act by engaging in two distinct conspiracies with Caterpillar dealers: a conspiracy to fix retail prices of Caterpillar replacement parts and a conspiracy to exclude Plaintiffs from the replacement parts market by means of the so called "black list." A restraint of trade under the Sherman Act is illegal only if it is an "unreasonable" restraint. *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243–44, 62 L.Ed. 683 (1918). The Supreme Court has held that:

> [R]estraint may be adjudged unreasonable either because it fits within a class of restraints that have been held to be "per se" unreasonable, or because it violates what has come to be known as the "Rule of Reason," under which the "test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may depress or even destroy competition."

*Federal Trade Commission v. Indiana Federation of Dentists,* 476 U.S. 447, 458, 106 S.Ct. 2009, 2017, 90 L.Ed.2d 445 (1986) (citations omitted). A conspiracy to fix prices is a "per se" violation of antitrust laws and the anticompetitive effects of such actions are assumed. *Business Electronics Corp. v. Sharp,* 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988); *Monsanto v. Spray–Rite*

*Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). The "black list," however, would be a vertical restraint on trade and would thus be subject to the "Rule of Reason" approach. *Continental T.V. v. G.T.E. Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

### 1. Price–Fixing

■ Plaintiffs alleged that Caterpillar conspired with the Caterpillar dealers to eliminate the pre-policy discounting program and to maintain a unilateral suggested manufacturer price. An agreement to eliminate discounts would be equivalent to an agreement to fix prices and would thus be subject to the "per se" antitrust approach. *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 648, 100 S.Ct. 1925, 1928, 64 L.Ed.2d 580 (1980). To prove a "per se" violation, Plaintiffs must show by a preponderance of the evidence that: 1) there was a combination or conspiracy between Caterpillar and its dealers to fix the price at which dealers sell genuine Caterpillar parts and 2) Plaintiffs were injured as a proximate result of the price-fixing. *See Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 341–343, 110 S.Ct. 1884, 1892–94, 109 L.Ed.2d 333 (1990); *Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 723–725, 108 S.Ct. 1515, 1518–20, 99 L.Ed.2d 808 (1988).

■ In order to prove the first element of a "per se" violation to fix prices, a plaintiff must present evidence which shows that there was an "agreement on the price or price level to be charged." *Sharp,* 485 U.S. at 726–727, 108 S.Ct. at 1521. In *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 763–765, 104 S.Ct. 1464, 1470–71, 79 L.Ed.2d 775 (1984), the Supreme Court announced the standard for evaluating the evidence presented to show that a price-fixing conspiracy existed. The Court held that:

> The correct standard is that there must be evidence that tends to exclude the possibility of independent action by the manufacturer and distributor. That is, there must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious com-

mitment to a common scheme designed to achieve an unlawful objective.

*Id.* at 768, 104 S.Ct. at 1473. There must be something more than evidence merely showing that dealers conformed to the suggested retail price of the distributor. *Id.* "Conduct that is as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita Electronic Industries Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Plaintiffs have presented three categories of evidence to prove that a conspiracy existed to fix the retail price of Genuine Caterpillar parts: 1) internal Caterpillar documents detailing price complaints of end users and discussing the structure of the Caterpillar pricing system; 2) Caterpillar documents which discuss the discounts offered to end users; and 3) testimony from Gonzalez regarding phone conversations with Caterpillar parts dealers who refused to discount because of Caterpillar. While this evidence and other testimony in the case may be sufficient to present a question for the jury on the issue of a conspiracy to maintain the "black list," under the standard set forth in *Monsanto,* evidence showing a conspiracy existed which included an agreement to fix prices is absent. *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1470–71.

■ Plaintiffs initially claim that Caterpillar's internal documents prove the existence of a conspiracy to fix retail prices. Plaintiffs' Exhibit 33 is an example of the kind of documents that Plaintiffs proffer to show a "meeting of the minds" in the execution of an agreement to fix prices. Plaintiffs' Exhibit 33, however, is merely a memorandum which details the complaints of customers as a result of the policies of CES and which suggests possible responses. Included in those complaints is a telephone call from an end user inquiring of Caterpillar why dealers were being instructed to "quote only list price." The naked assumption of a disgruntled customer, reported by a third party, does not present evidence which could prove an actual conspiracy between Caterpillar and Caterpillar dealers. Exhibit 33 merely presents the unsubstantiated speculation of one Caterpillar customer as to his inability to attain any discounts from his Caterpillar dealer.

Plaintiffs also presented a few Exhibits discussing Caterpillar's goal of achieving price integrity in their "parts pricing practices." (e.g. Plaintiffs' Exhibit 164). These documents refer to the "Export Dealer Net Price" and not the retail price that the dealers charge to customers. (Plaintiffs' Exhibit 672). The "Export Dealers Net Price" is the wholesale price that Caterpillar charges its dealers. Caterpillar sets this price unilaterally. Caterpillar pricing at the wholesale level indirectly affects the ultimate price at the retail level without any collusive action, and cannot form the basis of a conspiracy because the passing on of price increases is a normal function of the market and not a product of an agreement. *Matsushita,* 475 U.S. at 588, 106 S.Ct. at 1356 ("Conduct that is as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy."). To find that raising the wholesale price of a manufacturer's product to a competitive level could form the basis of a conspiracy under Section I of the Sherman Act would expose every company which sought to raise wholesale prices to an antitrust claim.

■ Plaintiffs, in support of its conspiracy theory, next presented documents discussing the discount policies of Caterpillar dealers. These documents reported to Caterpillar the discounts that the dealers would provide to end users. For example, Plaintiffs' Exhibit 326 is a letter from a Caterpillar dealer to Wade Hartman, a Caterpillar District Manager, discussing the discounts offered to customers. The letter reports that the dealer followed Hartman's recommendations in dealing with the customer, but does not identify whether the recommendations were for the purpose of setting a price or advising Caterpillar dealers in other matters with relation to the customers. These documents might provide circumstantial evidence that a conspiracy existed, but they fall far short of proving whether the goal of that conspiracy was too fix retail pricing of genuine Caterpillar parts by eliminating discounts or instead

to "black list" Plaintiffs. Plaintiffs never met their burden, under *Monsanto,* to present evidence showing the alleged conspiracy discussed in these documents was for the purpose of maintaining a fixed retail price as alleged in Plaintiffs' Amended Complaints. Therefore, Plaintiffs failed to prove the necessary "meeting of the minds" required to proceed under this theory. *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1470–71.

Plaintiffs' last category of evidence offered to prove the existence of a conspiracy is the testimony of Gonzalez regarding telephone conversations he had with Caterpillar dealers in an attempt to buy genuine Caterpillar parts at a discount. Gonzalez testified that dealers informed him that, at the request of Caterpillar and because he was on the "black list," they either were no longer able to either sell to him at all or were unable to offer him any discounts from the suggested manufacturer's price.

■ Statements of a coconspirator are admissible over a hearsay objection because they are not defined as hearsay under the federal rules:

> A statement is not hearsay if ... [t]he statement is offered by a party and is ... a statement by a coconspirator of a party during the course of and in furtherance of the conspiracy.

FED.R.EVID. 801(d)(2)(E). Before admitting coconspirator statements over an objection that it does not qualify under Rule 801(d)(2)(E), a court must find that the predicate condition has been met: that there was an actual conspiracy to accomplish the goals testified to in the statements. *Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987). The Supreme Court has held that when "the preliminary facts relevant to Rule 801(d)(2)(E) are disputed, the offering party must prove them, by a preponderance of the evidence." *Id.* at 176, 107 S.Ct. at 2779. In making this factual determination a court may examine the hearsay statements themselves as well as other circumstantial and direct evidence of a conspiracy. *Id.* at 181, 107 S.Ct. at 2781–82.

At trial the Court conditionally admitted Gonzalez's testimony regarding the phone conversations, over a hearsay objection, based on proffers of the underlying conspiracy which would be later proven at trial. Even accepting these statements, however, there is no evidence in the record from which a reasonable jury could find that a conspiracy existed to fix the retail price of genuine Caterpillar replacement parts. The hearsay statements do not show the requisite "meeting of the minds" needed to prove a conspiracy to "set the price level." *Sharp,* 485 U.S. at 724, 108 S.Ct. at 1519–20. Furthermore, the hearsay statements relate more to the inability of Caterpillar dealers to sell to Plaintiffs at any price because of the "black list" rather than their refusal to offer discounts in conjunction with CES.

Each of the three categories of evidence presented to show the existence of a conspiracy to fix the retail price of replacement parts and the mechanisms to maintain that conspiracy more properly concerns the charge of "black listing" and not the charge of price-fixing. Under Plaintiffs' theory, the Court would have to apply the evidence of a conspiracy to "black list" Plaintiffs to an alleged conspiracy to maintain retail prices without any evidence to that effect. Plaintiffs' exhibits and proffered testimony show either a change in the wholesale export dealers net price or the conspiracy and agreement to "black list" and do not specifically prove an agreement to fix retail prices. While this evidence is sufficient to show a conspiracy to "black list" Plaintiffs[2], such evidence is not probative of the price-fixing conspiracy and can not support a jury verdict to that effect.

■ Even if there were sufficient evidence to prove that a conspiracy to fix prices existed, there is no evidence in the record to show that the price-fixing proximately caused Plaintiffs' damages. The very essence of Plaintiffs' "black list" claim is that they were unable to buy any replacement parts from Caterpillar. Generally, damages from an allegation of price-fixing are shown by comparing the price paid by the plaintiff within an anti-competitive market to the price that

2. See *Infra* p. ———.

would have been paid by the plaintiff in a competitive market. *Hanover Shoe v. United Shoe Machinery*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) ("[W]hen a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury ...."). Plaintiffs recognized this fact in their proposed jury instructions. Plaintiffs asked the Court to instruct the jury that:

> A proper method of calculating damages is to award plaintiffs the difference between the prices actually paid by the plaintiffs for Caterpillar-brand replacement parts and the prices it would have paid for that product in a fair market.

Plaintiffs' Proposed Jury Instructions, p. 88. Plaintiffs have not presented any evidence that they were offered or could have bought genuine Caterpillar parts at even the suggested retail price because they were on the "black list" and could not purchase any parts.

Plaintiffs, therefore, presented no evidence to show that they have overpaid for any Caterpillar products and if they have, what the overcharge was. Dixon claims that by being on Caterpillar's "black list" he was driven out of business and could no longer purchase Caterpillar parts from Caterpillar for export. Thus, Dixon does not claim any overcharge damages. His sole theory of recovery is the lost going-concern value of his business as a result of being excluded from the market. Gonzalez, likewise, approximates his damages from his inability to purchase and sell Caterpillar replacement parts. He also does not show any evidence of overcharge caused by Caterpillar's alleged conspiracy from which a jury could reasonably infer a damage amount. Because neither Plaintiff presented evidence from any period of time showing that they bought Genuine Caterpillar parts without the appropriate discounts and did not provide the causal link between their damage theories and the price fixing claim, Plaintiffs have not presented sufficient evidence for a reasonable jury to find for them on the "per se" claim of price-fixing.

## 2. Market Power

Plaintiffs also claim that Caterpillar violated Section I of the Sherman Act by conspiring with Caterpillar dealers to "black list" Plaintiffs and exclude them from the market of genuine Caterpillar parts. To prove a violation of Section I of the Sherman Act, Plaintiffs must initially prove that a conspiracy to restrain trade existed. 15 U.S.C. § 1.

█ Unlike the proof presented by Plaintiffs to show the existence of a conspiracy to fix prices, Plaintiffs have presented sufficient evidence to create a jury question on the issue of the existence of a conspiracy to exclude Plaintiffs from the market. For purposes of a Motion for Judgment as a Matter of Law the party opposing the motion need only present evidence sufficient to raise a factual question. FED.R.CIV.P. 50(a)(1). The evidence presented by Plaintiffs detailing the reinvoicing, audits, stings, and other enforcement techniques used by Caterpillar is sufficient to raise a question of fact for the jury.

█ A "black list" is a vertical restraint on competition and a "Rule of Reason" analysis is applied to determine if a vertical restraint is unreasonable. *Sylvania*, 433 U.S. at 44, 97 S.Ct. at 2554. In the Eleventh Circuit, the "Rule of Reason" approach requires a plaintiff to show that: 1) a relevant market existed that was affected by the challenged restraint; 2) the defendant possessed "market power" within the relevant market; 3) there was an anticompetitive effect in the intrabrand or interbrand market; and 4) the negative effects on competition are not outweighed by the positive effects on competition. *Graphic Products Distributors v. Itek Corp.*, 717 F.2d 1560, 1571–1573 (11th Cir. 1983); *see also Levine v. Central Florida Medical Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir.1996) ("the plaintiff must define the relevant market and establish that the defendants possessed power in that market.")

The first step in conducting a "Rule of Reason" analysis is defining the relevant market to assist in the trier of fact in the analysis of market power. *Thompson v. Metropolitan Multi–List*, 934 F.2d 1566, 1573 (11th Cir.1991). The relevant market consists of a product market and a geograph-

ic market that the product is sold in. *U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.*, 7 F.3d 986, 994 (11th Cir.1993). Plaintiffs and Defendant agree that the relevant geographic market for antitrust purposes is worldwide. The only question before this Court is what products are contained within that market.

A relevant product market is a market composed of products that compete with each other: that is, products that are reasonably interchangeable from a buyer's point of view. *Anchor*, 7 F.3d at 994. "The reasonable interchangeability of use or the cross elasticity of demand between a product and its substitutes constitutes the outer boundaries of a product market for antitrust purposes." *Id.* at 995. In *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), the Supreme Court defined the limits of the product market:

> In considering what is the relevant market for determining the control of prices and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that part of the trade or commerce monopolization of which may be illegal.

*du Pont*, 351 U.S. at 395, 76 S.Ct. at 1007. The composition of the relevant product market is a question of fact usually resolved by the jury. *Thompson v. Metropolitan Multi–List, Inc.*, 934 F.2d 1566, 1573 (11th Cir.1991) ("The parameters of a given market are a question of fact and therefore summary judgment is inappropriate if there are material differences of fact.").

In the instant case, Plaintiffs claim that the testimony of Gonzalez and Dixon is sufficient to define the relevant product market as comprising replacement parts for Caterpillar equipment. Both Gonzalez and Dixon testified that as buyers in the market place, they choose between genuine and non-genuine Caterpillar replacement parts to resell to end users. Gonzalez is currently still in business selling non-genuine "will-fit" parts for Caterpillar machines to customers to whom he previously sold the interchangeable genuine Caterpillar parts. Thus, although tenu-

ous, a reasonable jury could infer that the relevant product market is the market for all replacement parts for Caterpillar machines.

Caterpillar has also presented evidence which would define the relevant product market as the market for replacement Caterpillar Parts, either genuine or will-fit. Caterpillar presented end users who testified that they choose from either genuine Caterpillar parts or other will-fit parts depending on pricing, quality and service in purchasing replacement parts for their Caterpillar machines. While Dr. Myslinski, Caterpillar's expert witness, testified that application of life-cycle costing would necessitate a conclusion that the relevant product market would include the entire Caterpillar system purchased, he also testified that other suppliers of will-fit parts produce interchangeable parts for over ninety percent of the 500,000 genuine Caterpillar replacement parts. That percentage becomes higher when parts that are in low demand are eliminated from the equation. Thus, for purposes of the Motion for Judgment as a Matter of Law, the relevant product market is defined as replacement parts for Caterpillar machines, either genuine or non-genuine will-fit parts.

Once a relevant market is defined, to survive Judgment as a Matter of Law Plaintiffs must present sufficient evidence to show that Caterpillar has market power in the relevant market. *Graphic Products*, 717 F.2d at 1571. Without market power, "any negative effect of exploitation of the intrabrand market (the competition between retailers of the same product) would be checked by competition in the interbrand market (competition over the same generic product) because consumers would substitute a different brand of the same product." *Sylvania*, 433 U.S. at 52, 97 S.Ct. at 2558. Market power is the power to either increase price and restrict output without the loss of business, or the ability to eliminate competition altogether. *E.I. du Pont*, 351 U.S. at 391, 76 S.Ct. at 1004–05. The Eleventh Circuit has defined market power more narrowly as "the ability to raise price significantly above the competitive level without losing all of one's business." *Graphic Products*, 717 F.2d at 1570. Under either

test, Plaintiffs have failed to meet their burden to prove market power.

Plaintiffs initially allege that Caterpillar had market power in the relevant market because it had the power to exclude competition in the genuine Caterpillar parts market, specifically, Plaintiffs. It is well established that, "[t]he antitrust laws are intended to protect competition, not competitors." *Levine v. Central Florida Medical Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir.1996). In *Spectrum Sports, Inc. v. McQuillan*, the Supreme Court held that:

> The purpose of the (Sherman) Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends° to destroy competition itself. It does so not out of solicitude for private concerns but out of concern for the public interest.

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458, 113 S.Ct. 884, 891–92, 122 L.Ed.2d 247 (1993); *See also Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). Additionally, Caterpillar has the power to control which sellers represent their products in the marketplace. *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 189 (2d Cir.1992).[3]

■ Plaintiffs have presented evidence to show that Caterpillar might have the ability to exclude competitors of Caterpillar dealers in the intrabrand market for genuine Caterpillar parts, but Plaintiffs have not presented any evidence that Caterpillar could exclude interbrand competitors in the relevant market of replacement parts for Caterpillar machines worldwide. The only evidence in the record shows that competitors actually compete with Caterpillar in the interbrand market for over ninety percent of

the replacement parts for Caterpillar machines. Caterpillar, in computing their prices for genuine Caterpillar replacement parts, researches and competitively prices their parts against the interchangeable "will-fit" parts. Plaintiffs would have a jury infer market power by Caterpillar's ability to control the distribution of genuine Caterpillar parts and eliminate intrabrand competitors, but there is no evidence that this control affects the interbrand market in general, or the individual end users. The only harmful effects proven by the Plaintiffs are to competitors selling genuine Caterpillar parts, like themselves, in the intrabrand market.

In *Tarrant Service Agency v. American Standard, Inc.*, 12 F.3d 609 (6th Cir.1993), Trane, an air conditioning company, was accused of violating the Sherman Act by excluding service companies from authorization to sell genuine Trane parts. *Tarrant*, 12 F.3d at 612. Tarrant, an independent servicing agent who sold both generic and genuine Trane parts, was no longer able to buy genuine Trane parts. *Id.* Tarrant argued that Trane had monopoly power in the replacement parts market because Trane was able to increase service prices and exclude Tarrant from buying genuine replacement parts. *Id.* In rejecting that argument and upholding Judgment as a Matter of Law in favor of Trane, the Sixth Circuit held that:

> [W]itnesses testified that service contractors will be paying higher prices for Trane genuine parts in the absence of meaningful competition from Tarrant. Thus, Tarrant argues this evidence illustrates Trane's monopoly power. This argument ignores the fact that the relevant market includes Trane genuine parts, duplicator parts and generic parts. ***Tarrant has not produced evidence that Trane has the ability to control prices of duplicator parts produced by other manufacturers or the prices of generic parts. Additionally, Tarrant has not produced evidence that Trane has the power to exclude competition in either generic parts or duplicator***

---

**3.** A manufacturer who excludes certain distributors of its products does not violate antitrust laws absent a showing that the exclusion harmed interbrand competition in general. *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 735

(9th Cir.1987); *Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245 (5th Cir.1975); *Anthony Distributors, Inc. v. Miller Brewing Co.*, 882 F.Supp. 1024 (M.D.Fla.1995).

*parts.* Thus, Tarrant failed to produce evidence of the relevant market and Trane's alleged monopoly power within the relevant market which would present an issue of fact for the jury.

*Id.* at 615. In the instant case, like *Tarrant,* the exclusion of some resellers from selling genuine Caterpillar parts in the market is not probative of market power in the relevant market because it is the exclusion of competition, not competitors, that antitrust laws seek to protect.

Plaintiffs also allege that the increase in prices in the post-policy period indicates market power in the relevant market. Plaintiffs merely presented evidence of rising prices without discussing the increased prices in relation to the rest of the market. Evidence of increased pricing without reference to competitors' pricing or the overall context of the market is insufficient to show market power. *Levine,* 72 F.3d at 1552. Plaintiffs presented no evidence showing that the increase in price was to a supercompetitive level or out of line with the pricing of the interchangeable, will-fit parts. *Graphic Products,* 717 F.2d at 1570. Thus, from the evidence Plaintiffs presented at trial, no reasonable jury could find that Caterpillar had market power in the Caterpillar replacement parts market. Accordingly, Judgment as a Matter of Law for Defendants on the Section I "black list" claim is granted.

**B. Sherman Act Section II: Market Power**

■ Plaintiffs also allege violations under Section II of the Sherman Act, claiming that Caterpillar attempted and conspired to monopolize the replacement parts business. Specifically, Plaintiffs contend that Caterpillar used a "black list" to exclude competitors, and used retail price maintenance as a form of predatory pricing. The conduct of a single firm, governed by Section II of the Sherman Act, "is unlawful only when it threatens actual monopolization." *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 767, 104 S.Ct. 2731, 2739, 81 L.Ed.2d 628 (1984); *See also Lorain Journal Co. v. United States,* 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951); *United States v. Griffith,* 334

U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948). In order to threaten actual monopolization a plaintiff must prove that the defendant had or threatened to have monopoly power in the relevant market. *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456–457, 113 S.Ct. 884, 890–91, 122 L.Ed.2d 247 (1993); *United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

■ As discussed above, Caterpillar had no market power in the replacement parts market. Plaintiffs presented no evidence which showed that Caterpillar could exclude competition in the interbrand market, nor did they present evidence which showed that Caterpillar could raise prices to a supercompetitive level. Plaintiffs sole claim that Caterpillar possessed market power was their ability to exclude Plaintiffs from the intrabrand market and, as previously discussed, such evidence is insufficient. Thus, Caterpillar is entitled to Judgment as a Matter of Law on the Section II Claims.

**C. Antitrust Damages**

■ Even if Plaintiffs had presented evidence sufficient to state a claim under Section I or II of the Sherman Act, Plaintiffs' damage estimates are too speculative to support a jury award. A plaintiff's damages in a lost profits antitrust case are simply the profits that a plaintiff would have made in a competitive market absent the effects of the antitrust activity. *Los Angeles Memorial Coliseum Commission v. National Football League,* 791 F.2d 1356, 1367 (9th Cir.1986) ("A plaintiff's antitrust damages are to be calculated 'by a comparison of profits, price and values as affected by the conspiracy, with what they would have been in its absence under freely competitive conditions.' "). Antitrust plaintiffs may present approximate damage estimates to the jury and let the jury infer the exact amounts of damages from these approximations. *Story Parchment v. Paterson Parchment Paper,* 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). Even under this lenient standard of proof, there must still be at least some reasonable evidence from which the jury may deduce a damage award instead of the award just being a product of mere "speculation or guess."

*Story,* 282 U.S. at 562, 51 S.Ct. at 250. In computing damages, juries may take into account the "totality of the evidence" presented on the amount of damages even if isolated elements of the damage issue are inadequately proven, as long as the result as a whole has some basis in the evidence. *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 791 F.2d 1356, 1366 (9th Cir.1986).

The underlying rational for the more lenient standard of proof is the effect on the market by the anticompetitive actions of the defendant and the very speculative nature of proof required to show future profits in a hypothetical free market. The Fifth Circuit in *Malcolm v. Marathon Oil Co.,* 642 F.2d 845 (5th Cir.1981) held that:

> This relaxed standard (of proof) is based on a recognition of the difficulty in reconstructing events that might have happened but for the defendant's unlawful conduct. It is appropriate that if there is uncertainty, the defendant should bear the burden of that uncertainty because his unlawful actions created it.

*Malcolm,* 642 F.2d at 864. Factors subject to the more lenient standard of proof include the condition of the global economy, the assumptions underlying future profit margins, and the prospect of future sales and future customers. Thus, speculative evidence and inferences of damages which would normally not create a jury question are sufficient to be presented to the trier of fact in antitrust cases. To mitigate the damage award, a defendant may still raise these issues and put forth evidence discounting the damage assumptions of a plaintiff.

Before availing themselves of the more lenient standard of proof for antitrust damages, however, a plaintiff must prove that the plaintiff's damages were caused by an antitrust harm. The proof required for causation is a preponderance of the evidence. The Court in *Brunswick Corporation v. Pueblo Bowl–O–Mat Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) discussed plaintiff's burden in proving causation of antitrust injuries:

> [T]hey must prove more than injury casually linked to an illegal presence in the market. Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

*Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697. To allow the plaintiff to recover for injuries not caused by the antitrust violation would be to "force a defendant to pay treble damages for conduct that was determined to be entirely lawful." *MCI Communications Corporation v. American Telephone and Telegraph Company,* 708 F.2d 1081, 1163 (7th Cir.1983); *Multiflex, Inc. v. Samuel Moore & Company,* 709 F.2d 980, 989 (5th Cir.1983) ("There must be a casual connection between the violation shown and the injury asserted to support a private sector award of monetary damages."). Thus, a plaintiff in an antitrust case must disaggregate the lost profits suffered by the plaintiff to eliminate the loss caused by the legal competitive action of the defendant, even if the result of this disaggregation is a nominal jury award. *USFL v. NFL,* 842 F.2d 1335, 1378–1379 (2d Cir.1988). Plaintiffs, however, need not desegregate between illegal acts of the defendant. *MCI* 708 F.2d at 1162.

Gonzalez uses a derivative of the "before and after" model[4] to prove his damages.

---

**4.** This model compares the plaintiff's profit record "prior to the violation with that subsequent to it" in order to compute the change in profits attributable to the anticompetitive action. *Lehrman v. Gulf Oil Corp.,* 500 F.2d 659, 667 (5th Cir.1974). Functionally, this method is predominantly used where there is a plaintiff whose business is not completely driven out of the market or has a long standing profit record to compare against. Courts are sometimes hesitant to apply the before and after method because of difficulties in eliminating all of the various competitive and market factors which cause fluctuations in profits over time. See *Isaksen v. Vermont Castings, Inc.,* 825 F.2d 1158, 1165 (7th Cir.1987) ("Post hoc ergo propter hoc is not a valid methodology of damage calculation, especially when it is apparent that other causal factors are at work.") The before and after method is a very accurate method, however, to compute lost profit damages in cases where the market conditions are relatively static over time or

Gonzalez took his total profits for the period before the alleged anticompetitive actions of Caterpillar and subtracted from that the profit earned through the sale of non-Caterpillar, generic parts.[5] Gonzalez then used this figure to estimate the future profits lost because of the antitrust conspiracy. Gonzalez computed his profits from non-Caterpillar, generic parts as the cost of the parts bought for resale, as shown on their disbursement sheet, plus a ten percent margin. While the burden of proof is lenient in calculating the prospective profit margin subtracted and the potential for the future sale of products, Plaintiffs must still prove the amount of profit not realized from the markets affected by the anticompetitive conspiracy by a preponderance of the evidence. The exclusion of profits from competitive markets is a related to the causal link to the damages and not the quantitative amount of damages afforded the lesser burden of proof.

■■■ Plaintiffs correctly cites *Malcolm* as Eleventh Circuit precedent holding that an antitrust plaintiff need not prove that the antitrust conspiracy be the sole cause of the damages claimed in order to impose liability upon the Defendant. *Malcolm*, 642 F.2d at 861. This, however, is not inconsistent with the requirement of *USFL* that a plaintiff must trace the distinguishable portions of his damages to their causal link in order to differentiate between the profits realized from competitive and non-competitive markets. *USFL*, 842 F.2d at 1378. *Malcolm* addresses the issue of whether or not any damages may be imposed upon a defendant who took both legal and illegal actions to achieve the same anticompetitive ends, i.e. preventing a dealer from selling to a reseller. This is not the same as requiring a plaintiff to eliminate the profits which would not have been affected at all by the alleged antitrust activities. By proving his damages through the subtraction of the profits derived from competitive markets from the total profits derived from both competitive markets and non-competitive markets, instead of adding up the total profits lost from lack of the ability to compete in non-competitive markets, Gonzalez failed to provide sufficient evidence to show that his total damage claim was a result of an antitrust injury.

## D. State Claims

■■■ Caterpillar also requests Judgment as a Matter of Law regarding the state claims of fraud and tortious interference. To recover for fraud, Plaintiffs must show that Caterpillar: 1) made a false statement or omission of material fact; 2) knew or should have known the statement was materially false; 3) intended for the representation to induce action by Plaintiffs; and 4) Plaintiffs justifiable and detrimentally relied on the representation. *Kramer v. Unitas*, 831 F.2d 994, 998 (11th Cir.1987). To recover for tortious interference Plaintiffs must show: 1) the existence of business relationships; 2) Caterpillar's knowledge of the relationships; 3) intentional and unjustified interference; and 4) damage as a result of the breach of the business relationship. *Tamiami Trail Tours, Inc. v. Cotton*, 463 So.2d 1126, 1127 (Fla.1985).

■■■ While the evidence supporting each of these claims was tenuous at trial, Plaintiffs did present sufficient evidence through the testimony of Gonzalez and Dixon to establish a *prima facie* case. Both Gonzalez and Dixon testified that Caterpillar representatives assured them that their customer lists would be kept confidential and that no Caterpillar dealers would have access to those names. Plaintiffs also presented evidence showing that Caterpillar then distributed those names and the Plaintiffs lost end users as a result. While Caterpillar denied these claims and argued that Plaintiffs waived their claims of fraud and tortious interference by continuing to do business with Caterpillar and continuing to turn over customer lists, this is a question of fact properly reserved for the jury.

---

where there is sufficient data from a competitive period.

5. Plaintiffs may choose any method of proof available to them to show their lost profits even if these methods are unique and "specifically tailored" to the plaintiff. *Fishman v. Estate of Wirtz*, 807 F.2d 520, 551 (7th Cir.1986) (citing *Park v. El Paso Board of Realtors*, 764 F.2d 1053, 1068 (5th Cir.1985)).

### E. Injunctive Relief

Finally, at the close of the trial, Plaintiffs orally requested that the Court grant an injunction, pursuant to 15 U.S.C. § 26, restraining Caterpillar from implementing the "Export Parts Policy" and other illegal activity under the Sherman Act. 15 U.S.C. § 26 provides that "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief ... against any threatened loss or damage by a violation of the antitrust laws... ." Injunctive relief, however, is contingent upon proof by Plaintiffs of an antitrust injury. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); *Local Beauty Supply, Inc. v. Lamaur Inc.*, 787 F.2d 1197 (7th Cir.1986).

In light of the above findings that Caterpillar's "Export Parts Policy" and the other actions of CES are permissible under the Sherman Act and that no antitrust injury was suffered by Plaintiffs, a request for injunctive relief is inappropriate.

### VI. Conclusion

Because Plaintiffs did not present sufficient evidence to raise a question of fact for the jury on the issues of the conspiracy to price fix as well as the market power of Caterpillar in the world-wide replacement parts market, it is

**ORDERED AND ADJUDGED** that:

1) Defendant's Motion for Judgment a Matter of Law with regards to Counts III (Section I of the Sherman Act) and IV (Section II of the Sherman Act) is **GRANTED.**

2) Plaintiffs' Motion for Judgment as a Matter of Law with regards to the relevant market and market power is **DENIED.**

3) Defendant's Motion for Judgment as a Matter of Law with regards to Counts I (Fraud) and II (Tortious Interference) is **DENIED.**

4) Plaintiffs' Motion to Voluntarily Dismiss Counts IX and X is **GRANTED** and those Counts of the Amended Complaints are

**DISMISSED WITH PREJUDICE.**

5) Plaintiffs' Oral Request for Injunctive Relief (Counts V and XI) is **DENIED.**